```
AB:JD/SEF/NMA
F. #2009R02400
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                             08 CR 559 (S-6) (CBA)

ANTHONY ANTICO,

        Defendant.

- - - - - - - - - - - - - - - - - -X


## THE GOVERNMENT'S RESPONSE IN OPPOSITION
## TO THE DEFENDANT'S MOTION TO SET ASIDE THE VERDICT

```
                                    LORETTA E. LYNCH
                                    United States Attorney
                                    Eastern District of New York
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201
```

```
Nicole M. Argentieri
Jack Dennehy
Stephen E. Frank
Assistant U.S. Attorneys
     (Of Counsel)
```

PRELIMINARY STATEMENT

The government submits this memorandum in opposition to the motion of defendant Anthony Antico, following his conviction after trial of racketeering conspiracy and illegal gambling, seeking a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

The defendant's motion is without merit. The jury was presented with overwhelming evidence of the defendant's guilt, including numerous recorded conversations in which the defendant and his co-conspirators discussed his crimes at length. The defendant points to no unfairness in the trial or errors to suggest that the jury reached a seriously erroneous result or that the verdict was a miscarriage of justice. For these reasons, as further set forth below, the defendant's motion should be denied.

BACKGROUND

Superseding Indictment S-6 (the "Superseding Indictment") charged the defendant with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One), illegal gambling, in violation of 18 U.S.C. § 1955 (Count Two), Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951(a) (Count Three), attempted robbery, in violation of 18 U.S.C. § 1951(a) (Count Four), and using and carrying a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Five).  The predicate acts alleged in the racketeering charge included: (a) conspiracy to extort Anthony Serafino in or about 1996 and 1997 (Racketeering Act One); (b) illegal gambling (which is also the subject of the charged gambling count) (Racketeering Act Two); (c) conspiracy to rob and attempted robbery of Louis Antonelli (which is also the subject of the charged robbery conspiracy, attempted robbery and firearm counts) (Racketeering Act Three); and (d) conspiracy to extort and conspiracy to rob Mario Gulinello in or about 2008 (Racketeering Act Four).

I.   The Trial and Counts of Conviction

On July 29, 2010, following two weeks of trial and four days of deliberations, the jury convicted Antico of Counts One and Two, charging racketeering conspiracy and illegal gambling, respectively.  The jury acquitted Antico of Counts Three, Four and Five, related to the attempted robbery of Louis Antonelli. Within Count One, the jury found proved Racketeering Acts Two and Four, relating to illegal gambling and the conspiracy to extort and to rob Mario Gulinello, and found not proved Racketeering Acts One and Three, relating to the extortion of Anthony Serafino and the robbery of Antonelli.

The sole issue raised in the defendant's Rule 33 motion is the jury's finding of Racketeering Act 4 as proved.[1]

II.  The Evidence At Trial

   A.   The Genovese Crime Family And Antico's Membership

At trial, the government proved the existence of the Genovese family and Antico's high-ranking position in it through, among other evidence, the testimony of cooperating witnesses, surveillance photographs, recorded conversations, and Antico's own prior sworn statements.  The evidence established that Antico rose to the rank of captain in the Genovese family and committed crimes with, among others, Genovese family soldier John Giglio

---

[1] Antico does not challenge either his conviction under Count Two (Illegal Gambling) or the jury's finding concerning Racketeering Act 2 (Illegal Gambling).  However, because the jury found as proved only one other racketeering act (Racketeering Act 2), Antico contends that the verdict on Count One must be set aside.

3

and Genovese family associate Joseph Barrafato, Jr.  Antico did not dispute either the existence of the Genovese family or his membership in it.  Indeed, his counsel effectively conceded that Antico was a member (T 1359, 1394, 1397, 1413), and the government introduced into evidence the defendant's sworn allocutions from 2005 and 2009, in which he pled guilty to racketeering charges that alleged his membership in the Genovese family.  (T 598-602, GX 147, 148).

The evidence further established that even while incarcerated, Antico expected and received money that Giglio and other Genovese family associates earned from their criminal activities.  For example, in various conversations intercepted pursuant to court-authorized wiretaps, Giglio discussed his obligation to Antico, stating, among other things, "Tony O just called me and, and I gotta give him money for the . . . month . . . torture," and "Alright, just try to think of stuff for Tony.  I gotta send him something. . . .  I gotta get money." (GX 114, 156, T. 1079).

B.   Robbery/Extorion Conspiracy of Mario Gulinello

Mario Gulinello testified that in 2004 he won $1.6 million by correctly picking the winners of six consecutive horse races in a lottery known as the "Pick Six," and that the news of his good fortune brought back numerous old "friends." (T. 942, 955).  Gulinello testified that in approximately 2008, he became reacquainted with Joseph Barrafato, Jr., whom he had not seen in over twenty years.  Barrafato and his cousin, Ralph Lento, whom

4

Gulinello believed to be degenerate gamblers, frequented an OTB parlor in Brooklyn that Gulinello also visited. (T 942-945, 953).

Gulinello testified that Barrafato, who bragged about being in the "street life" and a "made guy," was often out of money. Gulinello would, on occasion, pay for dinner or give Barrafato money for groceries, dog food and other items. Barrafato had been to Gulinello's home on occasion, and would sometimes say that Gulinello was "with us now," a statement that made Gulinello uneasy. Barrafato told Gulinello about his friend named "Tico," a "good guy" who would soon be coming home from jail. (T 945-947).

Gulinello testified that in approximately June 2008, Barrafato and Lento offered to take him for coffee at a nearby store. Once in a car with the men, Gulinello was driven some distance, to Coney Island. There, the car pulled alongside another vehicle and Barrafato stated to the occupant of that car, "Tico, say hello to my friend Mario." Gulinello, who preferred to be "in control of my situation," testified that he thereafter stopped associating with Barrafato and Lento. In response, Barrafato left Gulinello phone messages asking him to contact him. Gulinello was then contacted by agents of the FBI. He recalled telling the agents he had "a hunch" that Barrafato was trying to extort money from him. (T. 947-948).

Throughout June and July 2008, Antico and other co-conspirators were captured on court-authorized wiretaps engaging

5

in discussions with Barrafato about their plan to rob Gulinello. The jury heard the following taped excerpts concerning the plot:

<u>GX 117: June 28, 2008</u>

    Barrafato told Lento: "A couple of weeks from now, listen, we'll have money again . . . we'll have money, don't worry . . . Big Nose told me we'd have both money soon again."

<u>GX 131: July 9, 2008</u>

    Antico told Barrafato: "Are you there, at the OTB? . . . You gotta start moving around, my friend . . . Get that fuckin' guy to hang out with us!" Barrafato responded: "I'm tryin' to put a few things together . . . don't think I'm not tryin,' I'm out there. . . . I got a few things pannin'. . . the one, the one I told you about with that thing."

<u>GX 123: July 11, 2008</u>

| | |
|---|---|
| Antico: | What you doin'? |
| Barrafato: | I gotta do a little runnin' around. Try to put a few things together, you know? |
| Antico: | You did, or what? |
| Barrafato: | I'm gonna. . .I gotta see somebody tonight for somethin', you know? |
| Antico: | Yeah, really? |
| Barrafato: | We're puttin' something together. . . with that thing over there. |
| Antico: | Oh! Alright. |
| Barrafato: | Yeah, it's gonna be. . . we gotta do it. I, I can't wait no more. |
| Antico: | I know. Can't . . . fuckin' wait for it. |
| Barrafato: | No, I can't wait. I need the right ingredients to make the sauce, you know? |

6

        Antico:        Right.

        Barrafato:    That's the whole thing, it's the right ingredients . . . You know what I'm saying?  I'll keep you posted, you know?

        Antico:        Alright.

### GX 124: July 12, 2008

Barrafato discussed the plan with a potential participant in the robbery, asking him whether he knew another individual named Paulie who associated with Gulinello.  Barrafato discussed having Paulie bring the millionaire to them, and that they could put "maybe 20" in their pocket.  Barrafato further clarified that the victim would be the "guy that hit the Pick 6 for a million point six," describing him as "a real scumbag hard on."

### Gx 133: July 12, 2008

Less than one hour later, Barrafato discussed the plot with Antico:

        Antico:        Hello?

        Barrafato:    Tony!

        Antico:        You bum, ya.

        Barrafato:    Ah, I been runnin' around tryin' to put things together, ya know?

        Antico:        And ya got it together?

        Barrafato:    We're gonna, we're gonna do, we're gonna do it this week.

        Antico:        With those, with those guys?

        Barrafato:    With no, no, somebody else.  Me and somebody else.

|           |           |
|-----------|-----------|
| Antico:   | Oh you're gonna, they're gonna do it, they're gonna do? |
| Barrafato: | I wanna go, I wanna go over it with you before, ya know, because I'm at a point now, ya know what I'm saying? |

GX 125: July 12, 2008

Five minutes later, Barrafato spoke with Lento, telling his cousin:  "You gotta make yourself available, I'm gonna put you down on something, something good. . . .  It's gotta be done right away.  I just got in touch with Big Nose, you know?  You know what I'm saying?  I just spoke to Big Nose and uh. . . .  I guess he's gonna talk to Frankie before, but you are down on it. . . .  At least we'll get ourselves above water."

GX 126: July 15, 2008

|           |           |
|-----------|-----------|
| Barrafato: | What I was tellin' you?  Yeah, we did a little leg work. |
| Antico:   | Huh? |
| Barrafato: | We did some leg work on it, you know? |
| Antico:   | Yeah, uh-huh. |
| Barrafato: | Yeah, yeah.  We've been over (UI) we're gonna do it uh. . . the weekend. |
| Antico:   | Oh, yeah? |
| Barrafato: | Yeah.  We did the leg work, you know? The time, you know, and you know? |
| Antico:   | Yeah, yeah. |
| Barrafato: | Yeah, we're, we're gonna be alright soon.  Very soon. |
| Antico:   | I hope so. |

8

<u>GX 127: July 16, 2008</u>

    Antico:        Hello?

    Barrafato:    Hiya, Tony.

    Antico:        How are ya?

    Barrafato:    What's doin, buddy?

    Antico:        You're gonna rob anybody, or just, just you know, Hello?

Special Agent George Khouzami testified that on July 17, 2008, he and another FBI agent, concerned for Gulinello's safety in light of the robbery conspiracy, visited Barrafato's home on a pretext. Khouzami had previously visited Gulinello as well to warn him of the danger. (T. 910). The evidence showed that immediately following the agents' visit, Barrafato called Antico.[2] Referring to the agents, Barrafato explained to Antico that he just had a visit from "the bad guys," and that they were asking about John Giglio. (GX 129, T 910-911).

The conspiracy to rob Mario Gulinello ended that day.

---

    [2] Antico used a phone registered to "First Name: None; Last Name: None." Barrafato's phone was registered in the name of "Carmella Vetre." (T. 833, 835, 941; GX 161).

ARGUMENT

THE DEFENDANT CANNOT DEMONSTRATE THAT THE JURY
REACHED A SERIOUSLY ERRONEOUS RESULT OR THAT A
<u>NEW TRIAL IS NECESSARY TO AVERT A MISCARRIAGE OF JUSTICE</u>

The defendant seeks a new trial on the basis of his contention that "[a]t most, the government proved that Antico was open to the possibility and suspected that a crime might occur." (Br. 6). The defendant also makes a conclusory claim that the jury's finding with respect to the Gulinello conspiracy was tainted by "spillover prejudice" from the evidence concerning the attempted robbery of Louis Antonelli. (Br. 7). The defendant's arguments are without merit and his motion should be denied.

A.   <u>Legal Standard</u>

In ruling on a motion for a new trial under Rule 33, a court must determine "whether it would be a manifest injustice to let the guilty verdict stand." <u>United States v. Sanchez</u>, 969 F.2d 1409, 1413 (2d Cir. 1992)(reversing grant of new trial as an abuse of discretion). The court's discretion under Rule 33 "should be exercised sparingly," <u>id</u>. at 1414, and the court "must be careful not to usurp the role of the jury." <u>United States v. Canova</u>, 412 F.3d 331, 349 (2d Cir. 2005). While courts are permitted to evaluate the weight of the evidence and the credibility of witnesses,"it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessments." <u>Sanchez</u>, 969 F.2d at 1414. Accordingly, the "'ultimate test' is 'whether letting a guilty verdict stand would be a manifest

10

injustice.'" <u>Canova</u>, 412 F.3d at 349 (citations omitted).  In other words, "[t]here must be a real concern that an innocent person may have been convicted." <u>United States v. Snype</u>, 441 F.3d 119, 140 (2d Cir. 2006) (internal quotation marks omitted).

The Second Circuit has observed that "[t]he traditional deference accorded to a jury's verdict is especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." <u>United States v. Jackson</u>, 335 F.3d, 170, 180 (2d Cir. 2003) (citing <u>United States v. Pitre</u>, 960 F.2d 1112, 1121 (2d Cir. 1992)).  Moreover, "once a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." <u>United States v. Nusraty</u>, 867 F.2d 759, 762 (2d Cir. 1989) (citations and quotation marks omitted).

   B.  <u>Discussion</u>

      1.  <u>The Evidence of the Defendant's Involvement in the Gulinello Conspiracy Was Overwhelming</u>

The defendant's contention that "Antico had several general conversations with Barrafato about parting the Pick 6 winner from his money in one of any number of ways" (Br. 6) is predicated on his misleading use of evidence concerning an unrelated crime.  The defendant's attempt to employ the same strategy at trial was rejected by the Court – and it should be rejected again now.

11

Antico cites GX 118, a June 30, 2008, call with Barrafato, as evidence that Antico never specifically agreed to rob Gulinello. (Br. at 3). He contends that, in the call, "Barrafato tells him that he is recruiting guys to go in and rob the house," but "Antico says he was under the impression that Barrafato's plan was to send people to scare the Pick 6 guy so that he comes to Barrafato for protection ('play f . . . ing ping pong with them')." (Br. at 3).

Antico's contention is baseless because the conversation in GX 118 does not concern the Gulinello robbery.[3] At no time, in its closing arguments or otherwise, did the government cite GX 118 as evidence of the Gulinello robbery. To the contrary, the government's position was clear: that the call was relevant only as proof of the charged racketeering enterprise, and of the criminal relationship between the defendant and Barrafato. (T. 935-940). Indeed, the Court instructed the jury as follows:

> Ladies and gentlemen, I just want to provide you with a limiting instruction regarding a conversatioon that you heard in the transcript in your book at 118 dated June 30, 2008, a conversation between Antico and Barrafato. To the extent that there was any confusion, this transcript is offered not as direct evidence of the robbery identified in one of the predicate acts as – racketeering act as Pick 6 robbery. Rather, the government has offered it for a different purpose to show the relationship between the defendant and Barrafato Junior, and as evidence of the existence of the enterprise – one of the elements the government

---

[3] During that conversation, Joseph Barrafato, Jr. explains the plan: "No, no, no. They're gonna uh, go in Agazza and take whatever's there." To which Antico replies, "Oh! That's a different story. OK." (GX 118).

12

>has to establish in this case.  So that's the purpose
>for which it can be considered and of course, it is
>always up to you what weight you give the evidence that
>is presented.

(T. 941).

The defendant also cites <u>United States v. Mahaffy</u>, 499 F. Supp. 2d 291 (E.D.N.Y. 2007), and <u>United States v. Friedman</u>, 300 F.3d 111 (2d Cir. 2002), in support of his contention that there is insufficient evidence that he agreed with Barrafato to commit the Gulinello robbery.  Yet neither of those cases supports the defendant's argument.  In <u>Mahaffy</u>, Judge Weinstein <u>declined</u> to set aside the jury's verdict, noting that "the government is entitled to prove its case solely through circumstantial evidence," and concluding that "[s]ufficient proof was presented at trial from which a rational juror could infer" that the defendants knowingly participated in the charged conspiracy.  <u>Mahaffy</u>, 499 F. Supp. 2d at 295 (quoting <u>United States v. Rodriguez</u>, 392 F.3d 539, 544 (2d Cir. 2004)) (internal quotation marks omitted).  In <u>Friedman</u>, the Second Circuit set forth the types of circumstantial evidence that might suffice to prove the requisite knowledge or intent, including "evidence that the defendant participated in conversations directly related to the substance of the conspiracy, . . . 'proof that a defendant exercised authority within the conspiracy itself,' 'receipt of a share of profits from the conspiracy,' or a defendant's statements 'explicitly confirming the nature of the activity in which the co-conspirators were engaged.'"  <u>Friedman</u>, 300 F.3d at 126 (citations and alterations omitted).  In <u>Friedman</u> itself, the

court set aside the verdict because "[n]one of these 'indicia'" was present. Id. Here, by contrast, each of them is present.

First, the government presented multiple tapes in which the defendant discussed the conspiracy with Barrafato. In one of those conversations, for example, the defendant instructed Barrafato to "[g]et that fuckin' guy to hang out with us" – an order directly referencing Gulinello, the victim of the conspiracy. (GX 131). Several days later, Barrafato reported back to the defendant that "we did some leg work on it," and "we're gonna do it uh . . . the weekend." (GX 126). The following day, the defendant inquired whether Barrafato was "gonna rob anybody." (GX 127).

The defendant's involvement in the conspiracy was also made plain through other evidence. For example, Gulinello testified that the sinister drive during which Barrafato and Lento introduced him to the defendant made him feel "manipulated" and not "in control of [his] situation." (T. 945-948). Barrafato, who had bragged to Gulinello about being a "made guy" in the "street life," had also informed him that "Tico" was a "good guy" who would soon be coming home from jail. (T. 945-948).

Second, the evidence proved that the defendant exercised authority within the conspiracy. For example, Barrafato explicitly sought the defendant's approval of the details of the plan. (See, e.g., GX 133) ("I wanna go, I wanna go over it with you before, ya know."). Barrafato also made

clear to other co-conspirators that the robbery had the defendant's approval.  (See, e.g., GX 126) ("I just spoke to Big Nose and uh . . . I guess he's gonna talk to Frankie before, but you are down on it.").

    Third, the evidence proved that the defendant expected to receive a share of the profits from the conspiracy.  Indeed, the government introduced a conversation in which Barrafato reported to Ralph Lento, his cousin and co-conspirator in the robbery, that "Big Nose told me we'd have both money soon again." (GX 128).  Barrafato later told the defendant, in the course of discussing the plan, that "we're gonna be alright soon.  Very soon," to which the defendant responded:  "I hope so."  (GX 126). In addition, the government proved through the testimony of multiple witnesses and the introduction of numerous recorded conversations that the defendant, as a high-ranking member of the Genovese family, received money from the criminal activities engaged in by his associates.

    For example, Gambino family captain Michael DiLeonardo testified, "Basically, the mob is about money.  The whole thing is to generate money.  Kicking up means you go up the ladder from being an associate, soldier, captain, into the administration of the family – with monies.  Everything runs uphill when it comes to money." (T. 84).  Colombo soldier Mickey Souza testified similarly, that the purpose of La Cosa Nostra is "to generate money...you pay up, up to your skipper, which is the boss." (T. 329).  In addition, the jury heard taped conversations of John

15

Giglio repeatedly referring to his obligations to send money to the defendant every month: "Tony O just called me and, and I gotta give him money for the . . . month . . . torture," and "Alright, just try to think of stuff for Tony.  I gotta send him something. . . .  I gotta get money." (GX 114, 156, T. 1079).

<u>Fourth</u>, as set forth above, the defendant's tape-recorded statement on July 16, 2008 – one day before the FBI interrupted the robbery plan – asking whether Barrafato was "gonna rob anybody" (GX 127), constituted an explicit confirmation of "the nature of the activity in which the co-conspirators were enagged."  Accordingly, even leaving aside the other evidence of Antico's direct involvement in the plan to rob Gulinello – such as Gulinello's testimony concerning his ominous encounter with Antico – the recordings alone provide ample proof from which a rational juror could conclude that the defendant knowingly participated in the charged conspiracy.

In the absence of the defendant's attempt to use GX 118 to confuse the issue, the evidence before the jury concerning the Gulinello robbery was thus clear:  Antico and Barrafato conspired, together with others, to take Gulinello's money by force.  Antico's contention that "at most he was open to the possibility and suspected a crime might occur" is absurd in light of this evidence.  Viewed in its totality, the evidence provides a strong basis for the jury's verdict, and in no way supports the defendant's motion to set that verdict aside.

16

### 2. There Was No Spillover Prejudice

The defendant conclusorily asserts that the evidence related to the shooting and botched robbery of Louis Antonelli had a prejudicial, "spillover effect" on the jury's verdict with respect to Racketeering Act 4.  (Br. 7).

A defendant bears a heavy burden when claiming prejudicial spillover.  See United States v. Friedman, 854 F.2d 535, 563 (2d Cir. 1988) ("The defendant must show that he or she suffered prejudice so substantial as to amount to a miscarriage of justice.")(internal quotation marks and citation omitted); United States v. Griffith, 284 F.3d 338, 351 (2d Cir. 2002).

"The concept of prejudicial spillover . . . requires an assessment of the likelihood that the jury, in considering one particular count or defendant, was affected by evidence that was relevant only to a different count or defendant."  United States v. Hamilton, 334 F.3d 170, 182 (2d Cir. 2003).  "The absence of such spillover is most readily inferable where the jury has convicted a defendant on some counts but not on others."  Id. at 183.  Such a verdict indicates "that the jury was able to distinguish between counts . . . and to assess separately the evidence pertinent to each," leaving "no basis for concluding that a new trial was warranted because of prejudicial spillover." Adelson, 237 Fed. App. at 717; see also United States v. Hunter, No. 08-cr-0852, 2010 WL 2836633, at *2 (2d Cir. July 20, 2010)(summary order) ("[T]he jury's determination that four of the predicate acts were not proven indicates that the jury was

17

not misguided by prejudice.") (further citation omitted); <u>United States v. Adelson</u>, 237 Fed. Appx. 713, 717, 2007 WL 2389681, at *3 (2d Cir. 2007) (same).

Here, the defendant contends that he was prejudiced with respect to the Gulinello robbery by evidence the jury found <u>insufficient</u> to convict him of the Antonelli robbery. The defendant does not, because he cannot, cite a single case in which a court has ordered a new trial on the ground of spillover prejudice arising from a count on which the defendant was acquitted. <u>See</u>, <u>e.g.</u>, <u>Hamilton</u>, 334 F.3d at 183 ("[N]o case has held that a defendant was entitled . . . to a new trial on the counts of conviction simply because the jury found the government's proof on other counts unpersuasive."). Moreover, the evidence of the two predicates involved "completely distinct fact patterns and . . . [could] be easily compartmentalized." <u>United States v. Rooney</u>, 37 F.3d 847, 856 (noting that in such instances "we normally will have undiminished faith that a jury has followed the court's instructions and has evaluated each count on the specific evidence attributed to it"). Accordingly, even were the evidence of the Gulinello and Antonelli robberies easily confused – which it was not, particularly insofar as it involved different participants – the fact that the jury acquitted Antico of the Antonelli robbery demonstrates that there could not have been any prejudicial spillover to the jury's evaluation of the evidence with respect to Gulinello.

C.  <u>Conclusion</u>

For the foregoing reasons, there is neither a "real concern that an innocent person may have been convicted" nor other "exceptional circumstances" that would warrant the Court overruling the jury's assessment of the evidence and the credibility of the witnesses.  <u>Sanchez</u>, 969 F.2d at 1414.  Accordingly, the government respectfully submits that the defendant's motion should be denied.

Dated:     Brooklyn, New York
           October 1, 2010

                                        Respectfully submitted,

                                        LORETTA E. LYNCH
                                        United States Attorney
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Nicole M. Argentieri
Jack Dennehy
Stephen E. Frank
Assistant U.S. Attorneys
     (Of Counsel)